# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., JOHN DOE, and JANE DOE, | |
| Plaintiffs, | Case No. _____ |
| v. | |
| TRUE THE VOTE, CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

Plaintiffs Fair Fight, Inc., John Doe, and Jane Doe, by and through the undersigned attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendants, and upon information and belief allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs Fair Fight, Inc., John Doe, and Jane Doe bring this lawsuit and seek this Court's immediate intervention to put a halt to Defendants' ongoing assault on the fundamental right to vote through their widespread and well-publicized attempts at voter suppression and intimidation.

2.      In the wake of the 2020 General Election, which saw historic turnout across the country and in Georgia, Defendant True the Vote, a Texas organization, has spearheaded a coordinated attack on Georgia's electoral system, threatening voters with entirely frivolous claims of fraudulent and illegal voting that have reached feverish heights in the weeks leading up to the January 5, 2021 runoff.

3.      While courts across the country (and in Georgia) have repeatedly found claims of widespread voter fraud in the 2020 General Election to be wholly without merit, Defendants remain undeterred, partnering up to engage in a massive operation to "catch" and expose supposedly illegal voters, in what True the Vote itself has described as "the most aggressive election integrity operation in American history."

4.      Crucially, the focus of these efforts has been to intimidate and deter eligible and qualified Georgians—particularly Black and brown voters and first-time voters—from exercising their fundamental right to vote. Just last week, for example, True the Vote announced that the organization, in partnership with electors in each Georgia county, intended to preemptively challenge the eligibility of more than 364,000 Georgians to vote on the grounds that these voters no longer reside in the State of Georgia. To be sure, these challenges are meritless because the "evidence" they have presented—purported lists of names culled from the U.S. Postal Service

2

National Change of Address ("NCOA") registry—is notoriously unreliable as a means of determining voter eligibility. Even assuming these registries are entirely accurate (which they are not), there are innumerable reasons why individuals may change their mailing address while maintaining residency in Georgia, including, for instance, temporary relocation for military service, employment, school, or travel. There is nothing improper about voting while outside of one's permanent residence; the concept of absentee voting accommodates exactly that. *See* O.C.G.A. § 21-2-380(b). Indeed, federal law plainly prohibits election officials from removing individuals from the voter rolls simply because of an address change unless several strict precautions are followed.

5.     To complement these mass voter challenges, Defendants are also recruiting volunteers to monitor voters as they return their ballots and are encouraging "citizen watchdogs" to report suspected instances of illegal voting to their 24/7 "voter integrity" hotline.

6.     As a final touch, Defendants also established a $1 million reward fund to "incentivize" individuals to report instances of "election malfeasance." The obvious effect of this million-dollar bounty will be to encourage Defendants' supporters to generate even more baseless accusations of voter fraud—an effort that

3

is likely to subject Georgia voters, and particularly Georgians of color, to harassment, particularly if they appeared on Defendants' erroneous and unsubstantiated lists of purportedly ineligible voters.

7.   While several counties have already rejected True the Vote's mass challenges, and multiple courts have already thrown out their supporters' frivolous claims of voter fraud, these repeated attempts at voter suppression have lasting effects on of the electorate: lawful voters will be deterred and intimidated from participating in the political process out of fear that they will be accused by Defendants and their supporters of voting illegally.

8.   These fears are objectively reasonable. In the past few weeks, as claims of voter fraud reached a fever pitch, many of Georgia's election workers were harassed and faced death threats. Defendants collectively fed this frenzy and continue to breed false claims of voter fraud—threatening the safety and well-being of Georgia's voters and its election workers.

9.   Defendants' conduct has created an atmosphere of intimidation and is plainly unlawful. In the aftermath of previous voter suppression efforts in our history, Congress responded forcefully by enacting laws that unequivocally prohibit

4

such conduct, including § 11(b) of the Voting Rights Act, which outlaws any acts that are objectively likely to intimidate voters. 52 U.S.C. § 10307(b).

10. Because Defendants' coordinated campaign of frivolous mass challenges to hundreds of thousands of voters, false accusations of fraudulent conduct, and encouragement of outright harassment of voters and election officials has and will continue to intimidate voters in violation of the Voting Rights Act, immediate judicial relief is critical to ensuring that Georgians can fully and freely participate in the electoral process and exercise the rights to which they are constitutionally entitled.

## **PARTIES**

11. Plaintiff Fair Fight, Inc. (Fair Fight) is a political action committee based in Georgia. Fair Fight's core mission is to secure the voting rights of Georgians, a mission that includes voter engagement and voter turn-out, particularly among young people and people of color. Fair Fight's mission is thwarted when, as is occurring because of Defendants' wrongdoing alleged in this Complaint, qualified voters in Georgia are unable to vote without intimidation or interference.

12. To combat the harm Defendants have caused and will continue to cause by lodging their frivolous challenges against hundreds of thousands of Georgians,

Fair Fight has already begun to divert and will continue to divert its limited resources, including staff time, volunteer time, and money, to educate voters about how to overcome voter suppression efforts and intimidation of voters.  In particular, Fair Fight has diverted, and will continue to divert, staff resources, volunteer resources, and funds to ensure that Georgians whose eligibility to vote has been challenged know that they are in fact eligible to vote.  In addition, because some counties are scheduling hearings to determine voters' eligibility based on Defendants' challenges, Fair Fight has diverted and will continue to divert staff resources, volunteer resources, and funds to ensure that voters have the support they need to defend themselves against such challenges.  Specifically, Fair Fight has and will continue to divert staff, monetary, and volunteer resources to monitor county challenge hearings, organize partner organizations to offer comments at the hearings, and contact individuals on the lists of challenged voters to offer information and support.

13.    To undertake the actions described above to counteract Defendants' wrongdoing, Fair Fight has diverted and will continue to divert resources from Fair Fight's mobilization efforts to encourage Georgians to vote in the January 5, 2021 runoff, which include phone banking, in-person events, as well as providing support

6

to voters during the January 5, 2021 runoff election cycle as they navigate absentee ballot hazards, long lines, and other impediments to voting.

14.   The actions that Fair Fight is taking to counteract Defendants' challenges and intimidation are not actions Fair Fight has taken in the past. These new actions are necessitated by and traceable to Defendants' wrongdoing described in this Complaint. If the relief requested in this Complaint is granted, that relief will redress Fair Fight's injuries.

15.   Plaintiff John Doe is a citizen and registered voter in Georgia. While John Doe's permanent residence is in Georgia, John Doe is temporarily located in another state for work. To ensure he would not miss any mail while on this work assignment, John Doe forwarded his mail to his current location. A few days ago, John Doe's name and address appeared on a list submitted by Defendants challenging John Doe's right to vote in Georgia. John Doe, however, is a fully qualified and eligible elector in Georgia. Because Defendants claimed that John Doe is not eligible to vote, and because Defendants' list containing John Doe's name and address has been published online, John Doe reasonably fears that Defendants and their supporters will subject him to harassment for voting. For the same reason, he is proceeding under a fictitious name in this lawsuit.

7

16.     Plaintiff Jane Doe is a citizen and registered voter in Georgia. While Jane Doe's permanent residence is in Georgia, and Jane Doe is in fact presently located in Georgia, Jane Doe is currently splitting her time between Georgia, where she works, and another state, for family obligations. To ensure she would not miss any mail while with family, Jane Doe forwarded her mail to her family's address. Recently, Jane Doe's name and address appeared on a list submitted by Defendants challenging Jane Doe's right to vote in Georgia. Jane Doe, however, is a fully qualified and eligible elector in Georgia. Because Defendants claimed that Jane Doe is not eligible to vote, and because Defendants' list containing Jane Doe's name and address has been published online, Jane Doe reasonably fears that Defendants and their supporters will subject her to harassment for voting. For the same reason, she is proceeding under a fictitious name in this lawsuit.

17.     Defendant True the Vote is a 501(c)(3) organization whose stated purpose is to combat voter fraud. While True the Vote is incorporated in Texas, the organization is responsible for coordinating efforts to challenge over 364,000 Georgians' eligibility to vote and recruiting Georgians to engage in its "ballot security" operation in Georgia in advance of the state's January Senate Runoff.

18.    Defendant Catherine Engelbrecht is the founder and Executive Director of True the Vote. Defendant Engelbrecht is a resident of Texas. Defendant Engelbrecht, as Executive Director of True the Vote, has organized True the Vote's "voter integrity" efforts in the state of Georgia, including organizing the mass challenges to over 364,000 Georgia voters.

19.    Defendant Derek Somerville is a resident of Forsyth County, Georgia. Upon information and belief, Defendant Somerville has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

20.    Defendant Mark Davis is a resident of Gwinnett County, Georgia. Upon information and belief, Defendant Davis has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

21.    Defendant Mark Williams is a resident of Gwinnett County, Georgia. Upon information and belief, Defendant Williams has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

9

22.    Defendant Ron Johnson is a resident of Jackson County, Georgia. Upon information and belief, Defendant Johnson has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

23.    Defendant James Cooper is a resident of Walton County, Georgia. Upon information and belief, Defendant Cooper has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

24.    Upon information and belief, Defendants John Does 1-10 have assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote. The identities and precise residences of all John Does are presently unknown to Plaintiffs and could not be ascertained prior to filing this Complaint. Plaintiffs will amend this complaint to add the true names and capacities of Does when his or her identities are known.

## **JURISDICTION AND VENUE**

25.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law.

26.    This Court has personal jurisdiction over the non-resident Defendants because Defendants caused and will continue to cause tortious injury in this state, *see* O.C.G.A. § 9-10-91(2), and have purposefully availed themselves of Georgia by coordinating and executing mass challenges in the state of Georgia, as explained throughout this Complaint. This Court also has personal jurisdiction over the resident Defendants.

27.    Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391, and in the Gainesville Division under Local Civ. R. 3.1, because several Defendants reside in this district and division, and events giving rise to the claim occurred within this district and division.

28.    This Court has the authority to enter declaratory and injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS AND LAW

**A.    DEFENDANTS HAVE A HISTORY OF USING MERITLESS CHALLENGES AND TACTICS TO INTIMIDATE VOTERS.**

29.    True the Vote has a long history of advancing meritless voter challenges and other tactics to intimidate and suppress Black and brown voters around the country.

30.   Among True the Vote's abusive tactics is the practice of "voter caging"—challenging one's voter registration on the basis of unreliable information.

31.   In 2012, for example, True the Vote submitted meritless challenges against voters in Ohio. *See* Ex. 6. Many of the challenges were submitted against low-income voters, and the majority of the challenges were later thrown out. Even still, voters who were challenged by True the Vote received a letter in the mail alerting them that their right to vote had been challenged—a notice voters reasonably find alarming.

32.   In Franklin County, Ohio, True the Vote trained its volunteers to use cameras to intimidate voters when they entered the polling place, record their names on tablet computers, and attempt to stop voters before they could cast their vote. *See* Ex. 7. True the Vote also provided software to local citizen groups to monitor prospective voters, which disproportionately targeted Black voters and college students. *See Ne. Ohio Coal. for the Homeless v. Husted* ("*NEOCH*"), No. 2:06-cv-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part on other grounds*, 837 F.3d 612 (6th Cir. 2016).

33.   That same year, the Harris County attorney's office received multiple calls about True the Vote's volunteers disrupting polling locations. When the

assistant county attorney visited True the Vote's offices to investigate, he found a map designating certain polling locations to target, which the county attorney interpreted "as the group's intention to target specific minority areas." Ex. 6.

## B. DEFENDANTS HAVE NOW LAUNCHED A COORDINATED CAMPAIGN TO HARASS AND INTIMIDATE VOTERS ACROSS GEORGIA.

34.    In the wake of Georgia's 2020 General Election, in which Georgia's Black and brown voters exercised their political power to elect their candidates of choice, certain organizations, including True the Vote, have erupted with unfounded claims that the 2020 General Election was plagued with fraudulent and illegal voting.

35.    While none of these claims have succeeded in court, the idea that the election was plagued by fraud and illegal voting has led to genuine harassment and threats. Georgia county election workers, for example have received so many threats in the past month that they have required police protection and patrols outside their homes. One Georgia election worker was even forced to go into hiding after his personal information was posted online.

36.    As one Republican Georgia election official pleaded with the public in a press conference in early December, if these feverish claims do not stop,

13

"[s]omeone is going to get hurt, someone is going to get shot, someone is going to get killed."

37.     This public plea, however, has not deterred Defendants from continuing to feed this frenzy. Indeed, Defendants continue to advance these dangerous accusations and have now engaged in a statewide campaign to intimidate and prevent Georgia voters from participating in Georgia's January Senate Runoff.

### The "Landmark" Voter Challenge Program

38.     On December 18—just two and a half weeks before Georgia's January Senate Runoff—True the Vote announced it was mounting a "landmark coordinated" effort "to preemptively challenge 364,541 potentially ineligible voters" across Georgia's 159 counties. Ex. 1. As of December 22, True the Vote confirmed that it had filed such challenges in at least 85 counties. *See* Ex. 8.

39.     This effort is so large that True the Vote has created its own dedicated email account, gaelectorchallenge@truethevote.com, for willing Georgians, or "patriots," as True the Vote calls them, to submit these voter challenges on their behalf. *See* Ex. 5.

40.     To date, True the Vote has publicly identified Defendants Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper as the

Georgians who have been critical in helping them to challenge hundreds of thousands of Georgia voters. *See* Ex. 1. Other John Doe Defendants have assisted True the Vote in this effort, but are currently unknown to Plaintiffs.

41. Defendants claim to bring these challenges under Georgia's "Elector Challenge" provision, which allows an individual to challenge a voter's eligibility if the individual can show probable cause exists that the voter does not meet the qualifications to cast a ballot. *See id.*; *see also* O.G.C.A. § 21-2-230.

42. As Defendants explained in their press release announcing this "landmark" effort, Defendants crafted their list of over 364,000 Georgians who they claim are "potentially ineligible" to vote by comparing Georgia's voter registration database to United States Postal Service's National Change of Address (NCOA) registry. *See* Ex. 1.

43. These challenges have already been rejected in several counties, and for good (and obvious) reasons. Georgia law does not require a voter to reside at their permanent in-state residence for that voter to lawfully cast a ballot in Georgia. *See* O.C.G.A. § 21-2-217 (describing, for example, that one does not lose residency for voting purposes if one moves away temporarily, is away attending college or university, has moved for government service, among other reasons).

15

44.    Thus, any Georgia voter who temporarily relocated, whether to attend school, for temporary employment, to be closer to family or care for someone ill during the pandemic, or even for military service, may request to receive mail at an address other than where they registered to vote without forfeiting their right to vote in the county where they are registered.

45.    And while Georgia establishes many rules for determining one's residency for voting purposes, *see* O.C.G.A. § 21-2-217(a), whether a voter's name appears in the NCOA registry or whether a voter forwarded their mail to a new address are not among the reasons that a person shall be considered to have lost their residence in the state or county under Georgia law. Indeed, the NCOA registry gives no explanation of why any individual requested a change of address, which is critical to determine whether a voter is eligible to vote under Georgia law.

46.    Federal law even prohibits a state from removing a voter from voter registration lists on the ground that the individual is suspected to have moved unless strict procedures are followed. Specifically, "[a] State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant changed residence unless" (1) the State receives written confirmation from the voter of change of address, or (2) the voter fails to respond to

16

a postcard notice, and also fails to vote in at least two subsequent federal general election cycles. 52 U.S.C. § 20507(d).

47.   In other words, there is nothing irregular or unusual about voting while outside of one's voting jurisdiction; indeed, the availability of absentee voting accommodates exactly that. *See* O.C.G.A. § 21-2-380(b).

48.   Defendants are fully aware that the lists they have presented are insufficient to require the outright removal of over 364,000 voters from Georgia's voter rolls. *See* Ex. 1 (True the Vote's press release acknowledging that their challenges will not in itself "remove voter names from the registry").

49.   The purpose of these challenges, then, is purely to raise the specter that certain Georgia voters are "illegal" and should not be permitted to vote—a claim that is squarely undermined by the fact that Georgia permits those temporarily away from their permanent Georgia residence to vote.

50.   But even if Defendants' "landmark" voter challenge effort is unsuccessful on the merits, as it surely will be, Defendants' actions—calling more than 364,000 voters' eligibility into doubt—will have real consequences.

51.   At the outset, if any Georgia county permits these challenges to move forward—even if the county does not remove those voters from the voter registration

rolls—those voters may be required to cast a provisional ballot or a challenged ballot in the January runoff election and incur the burden of re-establishing their eligibility to vote. *See* O.C.G.A. § 21-2-230. These voters may also be asked to appear at a hearing in an attempt to prove their eligibility—a difficult task under normal circumstances for a voter who is temporarily away from Georgia, and a task made even more difficult during a global pandemic.

52.   Additionally, when Defendants submit these lists of challenged voters, they become part of the public record, and predictably make their way online. Notably, an individual claiming to work with True the Vote online has already threatened that "[i]f the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC." Ex. 2.

53.   As one court explained in considering a similar mass challenge effort by the Montana Republican Party to voters based on change of address data, "[o]ne can imagine the mischief an immature political operative could inject into an election cycle were he to use the [challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy." *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D.

18

Mont. 2008). "Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged." *Id.*

54.     As another federal court explained when it prohibited the national Republican Party from engaging in similar "ballot security" measures:

> [I]t is all but certain that anti-fraud initiatives . . . will result in the disenfranchisement of many individuals whose eligibility is not in question. Some voters—especially in minority districts where the legacy of racism and history of clashes between the population and authorities has given rise to a suspicion of police and other officials—may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified, especially if the verification process becomes confrontational.

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 612 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

55.     This is precisely the effect that Defendants' "landmark" challenge effort has had and will have on Georgia voters. Those who are challenged, even if they are a lawful Georgia voter, may be afraid to exercise their right to vote now that their "legality" has been questioned.

56.     In this current political environment, in which cries of voter fraud have reached a fever pitch and have resulted in in doxing, harassment, and death threats,

qualified, eligible voters may fear they will be harassed if they exercise their right to vote simply because their names appeared on True the Vote's challenge lists.

## The Voter Monitoring Program and Million Dollar Bounty

57.   To complement Defendants' mass voter challenges for the January Senate Runoff, Defendants are recruiting volunteers to personally watch voters return ballots to drop box locations as part of their effort to implement the "most comprehensive ballot security initiative in Georgia history." Ex. 3.

58.   Along with this live monitoring effort, True the Vote also created a "voter integrity hotline" which will be available to "citizen watchdogs" "24 hours a day, seven days a week" to respond and "take action" as necessary. Ex. 3.

59.   True the Vote has itself described these efforts as "the most aggressive election integrity operation *in American history*."

60.   As a final touch, True the Vote also announced a program called "Validate the Vote"—an innocuous sounding initiative which allegedly established a $1 million reward fund to "incentivize" individuals to report instances of "election malfeasance." Ex. 4.

61.   In sum, Defendants have now published lists of hundreds of thousands of Georgians who they claim are ineligible to vote, recruited volunteers to monitor

voters as they return their ballots, urged "citizen watchdogs" to take photos and videos of illegal activity, and have now offered their supporters a one million dollar bounty as incentive to accuse individuals of voting illegally.

62.   These efforts, especially when considered together, will expose lawful Georgia voters to the threat of harassment from Defendants' supporters who may very well attempt to "catch and expose" illegal voting. This risk is most acute for the thousands of Georgians whom Defendants have wrongfully accused of being ineligible to vote.

## C.   VOTER INTIMIDATION TACTICS HAVE LONG BEEN JUSTIFIED AS EFFORTS TO PREVENT "VOTER FRAUD" OR ENSURE "ELECTORAL INTEGRITY"

63.   Defendants' purported justification in challenging hundreds of thousands of Georgians' eligibility to vote, along with their other attempts to suppress the vote, is to ensure the integrity of the election and prevent voter fraud.

64.   This is not surprising. Voter intimidation efforts, particularly those aimed at Black and brown voters, have frequently been "ostensibly aimed at combatting voter fraud." *NEOCH*, 2016 WL 3166251, at *28.

65.   As just one example, for forty years, the Republican National Committee (RNC) was bound by a Consent Decree prohibiting it from engaging in

"ballot security" efforts which were, in practice, simply voter intimidation tactics. This Consent Decree originated from, among other things, the RNC's practice of voter caging—that is, the practice of challenging voters' eligibility at the polls based on unreliable information, just as Defendants have done in Georgia with their mass challenge effort. *See Democratic Nat'l Comm.*, 671 F. Supp. 2d at 579. As a result of the Democratic National Committee's lawsuit to protect voters against these intimidation tactics, the RNC was prohibited from engaging in "ballot security" efforts until it was released from the Consent Decree just a few years ago.

66.    Similarly, in the early 1990s, the North Carolina Republican Party sent 150,000 postcards to primarily Black voters that included false information about the state's voter registration requirements and warned those voters it would be a "federal crime . . . to knowingly give false information about your name, residence or period of residence to an election official." 671 F. Supp. 2d at 581. The Department of Justice later sued the North Carolina Republican Party for voter intimidation and entered into a substantially similar consent decree with the state party. *See* Consent Order, *U.S. v. N.C. Republican Party*, No. 91-161-Civ-5F (E.D.N.C. Feb. 27, 1992).

67.   As one federal court explained in rejecting the RNC's request to engage in certain "ballot security" efforts in 2009, "[v]oter intimidation presents an ongoing threat to the participation of minority voters in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the [Defendant] is prevented from addressing by [engaging in ballot security efforts]." 671 F. Supp. 2d at 578-79.

68.   Of course, the notion of widespread voter fraud in modern American politics is itself a fraud. Courts that have examined the evidence have repeatedly concluded that widespread voter fraud does not exist. *See, e.g.*, *Mich. All. for Retired Americans et al. v. Benson, et al.*, No. 20-000108-MM at 16 (Mich. Ct. Cl. Sept. 18, 2020) ("The documentary evidence in this case reveals that the incidences of voter fraud and absentee ballot fraud are minimal and that the fears of the same are largely exaggerated."); *Harding v. Edwards*, No. 3:20-cv-00495, ECF No. 88 at 22-24 (M.D. La. Sept. 16, 2020) (explaining "Defendants' evidence [of voter fraud] is woefully inadequate"); *Paher v. Cegavske*, 2020 WL 2089813, at *6 & n.10 (D. Nev. Apr. 30, 2020) (finding "claim of voter fraud is without any factual basis"); *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014) (in a challenge to Pennsylvania's voter ID law, court

noting, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere"); *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH), ECF No. 50 at 25 (D.N.D. Aug. 1, 2016) (court concluding "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent"); *One Wis. Inst. v. Thomsen*, No. 15-cv-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016) *rev'd in part*, 963 F.3d 665 (federal judge remarking "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities"); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable.").

69.   Similarly, despite voluminous litigation challenging the results of the 2020 General Election, judges across the country, and from across the political spectrum, have concluded there is no evidence to support the theory that the General Election was plagued by widespread voter fraud, let alone any fraud at all.

24

70.    Undeterred by these findings, Defendants have assumed the role of vigilantes to prosecute those whom they deem ineligible to vote, while intimidating and deterring thousands of lawful voters in the process.

## D.    TO COMBAT THIS KIND OF VIGILANTISM, CONGRESS REPEATEDLY PROHIBITED ACTS OF VOTER INTIMIDATION

71.    The Ku Klux Klan Act of 1871 (the "Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect newly freed slaves and their supporters from violence and harassment. While the Klan Act is most well known for making state officials liable in federal court if they deprive anyone of their civil rights or the equal protection of the law, *see* 42 U.S.C. § 1983, the Klan Act also prohibited private actors from engaging in conspiracies to intimidate voters.  *See* 42 U.S.C. § 1985(3).

72.    Many years later, Congress reaffirmed its commitment to outlawing voter intimidation in the Civil Rights Act of 1957. That Act, now codified at 52 U.S.C. § 10101(b), prohibited any person from intimidating voters, or attempting to intimidate voters, "for the purpose of interfering with [the right to vote]." In the years following the Civil Rights Act, courts interpreted that provision to require purposeful intent to intimidate voters and to discriminate on the basis of race. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 750 (5th Cir. 1967) (holding plaintiffs failed to

prove voter intimidation under the Civil Rights Act because there was a good-faith, "legitimate" motive for the Defendants' actions).

73.    Several years after passing the Civil Rights Act, explicitly recognizing that voter intimidation would be difficult to prove under that Act, Congress passed § 11(b) of the Voting Rights Act. The text of § 11(b) reads: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . ." 52 U.S.C. § 10307(b). By its plain text, § 11(b) removed the "purpose" requirement found in the Civil Rights Act, thus removing the requirement that plaintiffs demonstrate a specific purpose to intimidate voters to bring a successful cause of action for voter intimidation.

74.    Indeed, in testimony before the Senate Judiciary Committee, then-Attorney General Katzenbach explained that § 11(b) "represents a substantial improvement over [the Civil Rights Act]," which now prohibits voting intimidation. Voting Rights, Part 1: *Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965). As Katzenbach further explained, "under [the VRA] no

26

subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . Rather, defendants would be deemed to intend the natural consequences of their acts." *Id.* The House Report went on to adopt this reasoning, explaining: "The prohibited acts of intimidation need not be racially motivated; indeed, unlike [the Civil Rights Act] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965).

75.    As a result, Plaintiffs need not show that Defendants have any specific, purposeful intent to intimidate voters (against voters of color or otherwise) to demonstrate a violation of § 11(b); rather, the legal test is whether Defendants' conduct is objectively intimidating or threatening to voters.

## CAUSES OF ACTION

### COUNT I
**Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)**

76.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 75 of this Complaint as though fully set forth herein.

77.    Section 11(b) of the Voting Rights Act prohibits any person, "whether acting under color of law or otherwise," from acts which "intimidate, threaten, or

coerce . . . any person for voting or attempting to vote," or any attempted acts to do so. 52 U.S.C. § 10307(b).

78.   Defendants, by engaging in an unprecedented effort to challenge the eligibility of hundreds of thousands of Georgians to vote, by recruiting "citizen watchdogs" to watch voters return their ballots, and by offering a $1 million reward to incentivize its supporters to find evidence of "illegal voting," have engaged in activities which are objectively likely to intimidate voters in violation of § 11(b) of the Voting Rights Act.

79.   Plaintiffs are entitled to a declaration that Defendants have violated § 11(b) of the Voting Rights Act and an injunction enjoining Defendants and their agents from any further activity which intimidates voters.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and:

A.   Declare that Defendants have violated § 11(b) of the Voting Rights Act.

B.   Temporarily and permanently enjoin the Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from:

    i.  Submitting challenges to any voter's eligibility in the State of Georgia;

    ii.  Contacting any voter at their home, in person, by mail, by phone, by internet, or by any other means, in an attempt to confirm their eligibility to vote;

    iii.  Participating in any poll-watching, poll-monitoring, or election-observing activities; recruiting and training individuals for these activities; or advertising these activities;

    iv.  Photographing or video recording voters or election workers during the course of voting or working at the polls;

C.    Require Defendants to withdraw their pending challenges to voters in each of Georgia's 159 counties.

D.    Order True the Vote to cease any and all operations in the State of Georgia.

E.    Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

F.    Grant such other and further relief as the Court deems just and proper.

Dated this, the 23rd day of December, 2020.

Respectfully Submitted,

Marc E. Elias*
Uzoma Nkwonta*
Christina A. Ford*
**PERKINS COIE LLP**
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
unkwonta@perkinscoie.com
christinaford@perkinscoie.com

Thomas J. Tobin*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
ttobin@perkinscoie.com

Molly E. Mitchell*
**PERKINS COIE LLP**
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Phone: (208) 343-3434
Fax: (208) 343-3232
mmitchell@perkinscoie.com

*Counsel for Plaintiffs*
**Pro hac vice motion* forthcoming

*s/Allegra J. Lawrence*
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum (GA Bar No. 980780)
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

30